IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LAWRENCE D. CHEATHAM,          )
                              )
        Plaintiff,            )
                              )
    v.                        )        CIVIL ACTION NO. 2:10cv94-SRW
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                              )
        Defendant.            )

**MEMORANDUM OPINION**

Plaintiff Lawrence D. Cheatham brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying his applications for a period of disability and disability insurance

benefits and for supplemental security income under the Social Security Act.  Plaintiff filed

his applications for benefits on May 31, 2005.  After the applications were denied initially,

he requested a hearing before an ALJ.  The ALJ issued an unfavorable decision on February

5, 2008, which plaintiff appealed to the Appeals Council. The Appeals Council granted

review and remanded the case for further proceedings.  The ALJ conducted a second hearing

on January 29, 2009.  On March 17, 2009, the ALJ issued a second decision, again finding

that plaintiff is not disabled within the meaning of the Social Security Act. (R. 13-151).

Plaintiff appealed the second unfavorable ALJ decision to the Appeals Council which, on

December 16, 2009, denied review. (R. 8-14).  Accordingly, the March 17, 2009, decision

of the ALJ stands as the final decision of the Commissioner.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

# BACKGROUND

## Plaintiff's Application for Benefits

Plaintiff was born on September 5, 1956.  (R. 94).  He has an eleventh grade education and past work as a construction framer. (R. 104, 107). On May 31, 2005, plaintiff filed an application for benefits, alleging that he became unable to work because of his disabling condition on June 28, 2004.  (R. 94-96).  In his disability report, plaintiff alleged that he is unable to work due to heart problems, high blood pressure and arthritis. He states that because of these impairments, he has weakness, pain and shortness of breath. (R. 103).

In a physical activities questionnaire, plaintiff indicated that if he stands too long, he gets dizzy.  If he walks too long, he gets shortness of breath and, if he sits too long, his legs and hands cramp up.  (R. 118).  He stated that he is able to stand for thirty minutes, walk for one hour and sit for three to four hours. (R. 118).  Plaintiff said that his wife assists him with his personal care, such as bathing, showering, dressing, shaving and hair care, and in everything that he does.  (R. 119).  Plaintiff asserted that he cannot stand for long because of numbness in his feet.  (R. 121). He stated that he is no longer able to drive because his eyesight has grown dim, and he has to sit in a position where he is able to straighten out his legs so that they won't cramp up.  He indicated that when his legs cramp he has no feeling in them for a period of time.  (R. 122).  He is able to walk for thirty minutes before he has to take a break.  (R. 123).

In a disability report plaintiff completed when he appealed the initial unfavorable

decision, he stated that his condition had grown worse and that it is difficult for him to get out of bed to perform his regular daily routine. (R. 137). He indicated that he is unable to perform any chores around the house and that his wife and daughter have to take care of these. (R. 140). Plaintiff wrote:

> My wife and daughter has taken over all responsibilities because I am not able to perform any duties. I am not able to dress myself. My doctor has ordered more test but due to the circumstances that I have no income or medical insurance I can't get the test done. Dr Arellano sends my medicines to me through the mail. She gives me supplies and samples when I need them. I am not able to pay for any medicines or medical attention. My sister in law and her family helps me whenever they can. I am very stressed about not having medical insurance for me or my family. My wife is not able to work because she takes care of me and my personal needs.

(R. 141).

### The Administrative Hearings

The ALJ conducted the first administrative hearing on July 24, 2007. (R. 291-343). Plaintiff testified that he had previously worked for his brother as a supervisor in a residential construction business. (R. 303). He stated that, due to his heart condition, he has pain twice a month that lasts for about ten or fifteen minutes and that it is "not too strong." (R. 304-05). He experiences this pain without any precipitating or aggravating factors. (R. 305). When the ALJ asked plaintiff whether there were any side effects of his medication, plaintiff responded only that, "Every so often I'll swell up." (Id.). He stated that he can lift a maximum of about five pounds and that he can stand about twenty minutes at a time. (R. 306). He testified that in an eight hour day, he thinks he could stand "[a]bout five hours," sit about three hours at a time for a total of seven hours, and walk for an hour at a time, for

a total of three hours. (R. 306-07). He is able to bend and stoop. (Id.). He stated that the maximum amount of weight he can carry occasionally is ten pounds. (R. 307-08). Plaintiff testified that he gets up at 7:00 a.m., has breakfast at about 8:00, and watches his two grandchildren until about noon. After lunch, he watches television until about 5:00 or 6:00 p.m. and, after dinner, he walks outdoors, sits on his porch and watches the children. (R. 308-09). Plaintiff watches television for about six hours each day and does not do any household chores or yard work. He walks a mile twice each week. He goes to church every Sunday, but does not go to sporting events. He testified that while he used to smoke, he no longer does. (R. 310-11). Plaintiff testified that, during the day, he has to rest after he is up for about three hours and that he rests two hours at a time about twice a day. (R. 312). He stated that shortness of breath is "normal," but that he has no other symptoms from his heart impairment. (R. 312). He stated that when he goes to church he does not stay through the entire service due to shortness of breath and sweating. He gets dizzy every time he goes out into the sunlight. (R. 312-13).

The ALJ heard testimony from a medical expert, Dr. Jack Evans. (R. 314-25). Dr. Evans testified that he had been present throughout the hearing, had listened to the claimant's testimony, and had reviewed the medical evidence in the case. (R. 314). Dr. Evans testified that, in his opinion, plaintiff's medical impairments, considered individually and in combination, did not meet or equal the listings. (R. 315). Dr. Evans explained which listings he considered and why he did not believe that plaintiff's medical records supported those

listings. (R. 315-17). He stated that plaintiff would have met or equaled a listing because of his low ejection fraction for a period of several months, but not for twelve months. (R. 318). Dr. Evans testified that, in his opinion, plaintiff could sit for an hour at a time for a total of eight hours in an eight hour day; stand for an hour at a time for a total of eight hours; walk for thirty minutes for a total of four hours; frequently lift or carry ten pounds; occasionally lift or carry twenty pounds; use his hands frequently for simple grasping and pushing and pulling of arm controls and fine manipulation; frequently push and pull leg controls; balance, stoop, crouch, kneel and crawl occasionally; never climb; frequently reach overhead; never drive automotive equipment or work around unprotected heights or moving machinery; and occasionally be exposed to marked changes in temperature and humidity. (R. 318-20).

Dr. Evans stated that plaintiff's medical condition reached this described level on or around December, 2004. (R. 320). He testified that, while plaintiff's initial ejection fraction in 2004 was low, it gradually improved with treatment. It started at 25%; in December 2005, it was 36%; and, in 2007, it was 55%. Dr. Evans concluded from this evidence that plaintiff was not in active congestive failure at that time. He explained that plaintiff's abnormal EKG revealed a "branch block," which is an electrical abnormality in heart conduction that does not have any definite relationship to heart function. (R. 321). Dr. Evans testified that the cardiologist's latest opinion of possible angina or ischemic heart disease or coronary artery disease had not been verified at that time as to plaintiff's left coronary artery. (R. 322). Dr. Evans testified that shortness of breath and fatigue is usually related to cardiac output and,

as the cardiac output improves, the symptoms should also improve.  (R. 323).

The ALJ also heard testimony from a Vocational Expert. (R. 325-337). The VE testimony that if plaintiff's testimony were accepted as true, he would be unable to perform his past relevant work due to his inability to stand more than twenty minutes at a time, his limited ability to lift and carry, and the need to take two two-hour rest periods during the day and, further, that he would not be able to perform other work in the regional economy.  (R. 330-31). The ALJ posed a hypothetical question to the VE, asking her to assume an individual who can perform the exertional demands of light work; frequently use his hands for simple grasping, pushing, and pulling of arm controls and fine manipulation; frequently use his legs for pushing and pulling of leg controls; occasionally stoop, crouch, kneel, crawl and balance; never climb; frequently reach overhead; never work around unprotected heights, moving machinery, or operating motor vehicle equipment; and occasionally work around exposure to marked changes in temperature and humidity while experiencing a moderate degree of pain lasting ten to fifteen minutes twice each month.  (R. 331-32).  The VE responded that such an individual could perform other work existing in the regional and national economies, including work as an assembler, hand packer, and counter clerk. (R. 332).  On questioning from plaintiff's attorney, the VE testified that four absences a month, as reflected on the two forms completed by Dr. Yearwood, would preclude work.  (R. 337).  She further stated that pain at the level described in the forms completed by Dr. Yearwood on April 9, 2007 would preclude work. (R. 336-37). At the conclusion of the hearing, the ALJ agreed to send plaintiff

for a consultative chest x-ray and pulmonary function test to determine whether plaintiff's shortness of breath was possibly caused by COPD, since it did not appear to be a result of his cardiac function.  (R. 337-42).

The ALJ issued his first unfavorable decision on February 5, 2008.  (R. 43-56).  On September 16, 2008, the Appeals Council remanded the case to the ALJ, concluding that Dr. Evans' assessment of claimant's RFC implied that claimant needs a sit/stand option, and the RFC assessed by the ALJ did not include this limitation.  (R. 84-85).  On January 29, 2009, the ALJ conducted a second administrative hearing.  The ALJ summarized the plaintiff's testimony from the previous hearing for the benefit of the vocational expert.  Plaintiff testified that he had not performed any work since the previous hearing.  (R. 350-51).  The ALJ asked plaintiff whether anything had changed with regard to the testimony he had summarized, and plaintiff responded that he has pain in his wrist since the previous year and that he had gunshot wounds.  (R. 352).  Plaintiff testified that he is able to sit for an hour but then must get up, and that he gets tired in his waist and in his leg, which affects his ability to lift.  (R. 353).  He stated that he is more fatigued than he was at the previous hearing and spends more time resting during the day, about two hours at a time for a total of about five hours.  (R. 354).  The ALJ admitted additional exhibits from the plaintiff.  (R. 358-359).

At the second hearing, the vocational expert was Dr. Stephen Cosgrove.  Dr. Cosgrove testified that – if plaintiff's testimony were fully credible – plaintiff could not perform his past relevant work, either as he actually performed it or as it is performed

generally in the national economy. (R. 359). He further testified that plaintiff could not perform other work due to his inability to stand, walk, lift or carry for extended periods of time and his need to lie down for five hours. (R. 359-60). The ALJ posed a hypothetical question to the vocational expert, asking him to assume an individual of the claimant's age, education and past relevant work who is capable of performing the exertional demands of light work, with additional specified exertional and non-exertional limitations. (R. 360-61). The VE responded that such an individual could not perform plaintiff's past relevant work but could perform other work existing in the regional or national economy. (R. 361). The ALJ posed another hypothetical question to the vocational expert, adding a sit/stand option and including additional limitations to the use of plaintiff's left hand due to plaintiff's wrist injury. (R. 362-63). The VE again responded that such an individual would not be able to perform plaintiff's past relevant work but could perform other work. (R. 363-64). Dr. Cosgrove testified that a person as limited as indicated in the forms completed by Dr. Yearwood in August 2006 and April 9, 2007 could not perform the jobs Dr. Cosgrove had previously recited or any other job. (R. 365-66). The ALJ closed the record and concluded the hearing. (R. 367-68).

## The Medical Records

On November 20, 2003, plaintiff sought treatment from Dr. Roland Yearwood. Dr. Yearwood noted that, on a previous visit, plaintiff was noted to have evidence of a left bundle branch block, that he was referred for a stress test, and that he was found to have

evidence of a diminished ejection fraction.  On examination, plaintiff's room air saturation was 97%. Dr. Yearwood's assessment was: (1) "Patient with history of HTN, currently controlled.  Patient was switched from Verapamil to Altace. In my notes he does have evidence of a diminished ejection fraction.  Blood pressure appears to be doing adequately at that time[,]" and (2) "Patient with history of cough etiology thought to be secondary to sinus infection." (R. 156).

Seven months later, on June 28, 2004, plaintiff reported to Dr. McGavock Porter, of Montgomery Cardiovascular Associates, for evaluation of his problems of hypertension, non-ischemic cardiomyopathy, and excessive ethanol ingestion. Dr. Porter noted that plaintiff's left ventricular ejection fraction at catherization several month previously was 25%, and that his "RCA showed 50% non-critical stenosis."  Dr. Porter further noted that plaintiff had been drinking about a six-pack or more daily but had cut this back to a six-pack every two weeks.  Plaintiff reported that he had not been short of breath or had chest pains and that, basically, he was doing well.  He reported getting depressed sometimes and that he usually smokes three cigarettes a day but smokes more when he is feeling depressed.  Dr. Porter continued plaintiff on his medications and scheduled him for follow-up in three months.  (R. 174).

Plaintiff returned to Dr. Porter for follow-up on September 8, 2004.  Dr. Porter wrote, "He is doing basically well, although he says that he has been using alcohol more than he was and also smoking some. He is not short of breath." (R. 171). Dr. Porter adjusted

plaintiff's medications. (R. 172).  Plaintiff returned to Dr. Porter for follow-up three months later, on December 8, 2004.  Plaintiff's problem list again included hypertension, non-ischemic cardiomyopathy, and excessive ethanol ingestion. Dr. Porter wrote, "He has cut back and only has three beers a week instead of a six-pack a day." (R. 168). He further noted, "He has mild coronary disease and non-ischemic cardiomyopathy.  He has gained five pounds.  He is not short of breath.  He has had no chest pain.  He smokes occasionally."  Dr. Porter again increased plaintiff's dosage of Coreg and continued his present dosage of Altace. He scheduled plaintiff to follow-up in three or four months.  (R. 168-69).

On February 3, 2005, plaintiff saw Dr. Yearwood for follow-up of right knee pain associated with climbing up and down ladders.  Dr. Yearwood noted that plaintiff also had a history of hypertension, which was stable, and that he was "currently following with Montgomery Cardiovascular Associates for his congestive heart failure."  (R. 154). Dr. Yearwood assessed hypertension, congestive heart failure, right knee sprain, and plantar fasciitis. (R. 154).

When plaintiff returned to Montgomery Cardiovascular Associates for follow-up on April 20, 2005, he saw Dr. Iliana Arellano.  Dr. Arellano's treatment note lists plaintiff's current problems as cardiomyopathy, abnormal graded exercise test, and hypertension.  She wrote:

Mr. Cheatham is a 58 year old[1] African-American male with history of

---

[1] This is an apparent typographical error.  Plaintiff was born on September 5, 1956 (R. 94) and, accordingly, was forty-eight years old in April 2005.

nonischemic cardiomyopathy probably alcohol induced and hypertension, here for follow-up. On his previous visit with Dr. Porter he was to have increased his Coreg to 25 mg bid, however, it appears that the patient is taking 12.5 mg bid. He states that he is doing well with no chest pain, no shortness of breath, no orthopnea, PND or pedal edema. He works as a construction worker and states that he does get tired after doing construction for about one hour. He has had no orthopnea, PND or pedal edema. He has had no palpitations or skipped beats, no presyncope or syncope.

(R. 166). Dr. Arellano assessed cardiomyopathy and hypertension. As to the cardiomyopathy, she wrote, "He is currently stable with pretty good exercise tolerance. He did not titrate his Coreg up to 25 bid. We will do this today. We will also add Aldactone 25 mg PO q day and start him on aspirin 325 mg PO q day. He also meets criteria for an ICD and we'll talk about that at his next visit. She noted that plaintiff's hypertension was poorly controlled and stated, "I have doubled up on his Coreg which may help his blood pressure but if not, we will need to start him on something else for his blood pressure [.]" She scheduled him for follow-up in one month or earlier if needed. (R. 166-67).

Plaintiff returned to Dr. Yearwood for follow-up on May 3, 2005. He denied any shortness of breath or chest pain, and his congestive heart failure was noted to be stable. Dr. Yearwood noted, also, that plaintiff's blood pressure was stable and that plaintiff had a history of Type II diabetes mellitus, controlled by diet. Dr. Yearwood reviewed plaintiff's lipids profile and found it to be within normal limits. Dr. Yearwood listed assessments of: hypertension, non-insulin dependent diabetes mellitus, hyperlipidemia, and congestive heart failure. (R. 152).

The following month, on June 2, 2005, plaintiff returned to Dr. Arellano at

12

Montgomery Cardiovascular Associates.  In her treatment note, Dr. Arellano wrote:

> Mr. Cheatham is a 48 year old male with history of nonischemic cardiomyopathy, EF 25%, hypertension, here for follow-up.  On his last visit his Coreg was increased to 25 mg bid.  He states he is doing well on that dose and does not have any significant side effects.  He was also started on Aldactone that had to be decreased every other day secondary to hyperkalemia.  He currently is doing well without any chest pain, no shortness of breath.  He has no orthopnea, PND or pedal edema.  He continues to work as a construction worker two times a week and is able to perform his tasks without any difficulty.  He does get mildly fatigued at the end of the day.

(R. 164).  Dr. Arellano further noted, as to plaintiff's cardiomyopathy and congestive heart failure, "Patient is currently compensated without any overt CHF on physical exam.  He is on the maximum dosage of his CHF medications.  He is to continue these current doses.  We have talked today about meeting criteria for an ICD, however, the patient would like to think about this and he will get back to us if he decides to proceed with this."  Dr. Arellano further noted that plaintiff's hypertension was "currently well controlled after increasing his Coreg to 25 mg bid."  She scheduled plaintiff for follow-up in six months.  (R. 164-65).

Plaintiff returned to Dr. Arellano for his six-month follow-up on December 1, 2005.  Dr. Arellano noted:

> Mr. Cheatham is a 49 year old African-American male with history of cardiomyopathy with an injection fraction of approximately 30% by last echo in 2003, history of hypertension, here for follow-up.  He currently states that he is doing well.  He's had no orthopnea, PND or pedal edema, no dyspnea on exertion, no chest pain, no palpitations, no presyncope or syncope. He walks one mile everyday in 45 minutes.

(R. 189). With regard to plaintiff's congestive heart failure/cardiomyopathy Dr. Arellano observed, "He is currently well compensated with good exercise tolerance. He is on a

13

maximum dose of medications including Altace 10 mg bid, Coreg 25 mg bid and Aldactone.

I have asked him to start BiDil today ½ tablet bid for a week and then increase this to a full

tablet tid.  Patient will have an echocardiogram today to assess his ejection fraction.  If his

EF is less than 30 he will meet criteria for an ICD, however, the patient has refused this in

the past and I doubt he will want to have this.  He does not have any insurance.  She noted

that the BiDil was for his hypertension, which was poorly controlled that day, and she had

also started him on hydrochlorothiazide for hypertension.  Dr. Arellano again scheduled

plaintiff for follow-up in six months or earlier, if needed.  (R. 190).  The echocardiogram

revealed "[d]ilated cardiomyopathy with mildly severe depressed left ventricular systolic

function with an ejection fraction approximately 25%," trace mitral and tricuspid

regurgitation and mild diastolic dysfunction.  (R. 188).

Plaintiff returned to Dr. Arellano on June 8, 2006.  He stated that he was "doing well" and

he denied any orthopnea, PND or pedal edema. He further denied any dyspnea on exertion and

stated that he was able to walk one mile in thirty minutes without any difficulty.  He reported no

chest pain, no presyncope or syncope and no palpitations.  Dr. Arellano and plaintiff discussed the

need for an ICD and plaintiff stated that he was not able to afford it because he has no insurance.

(R. 185).  On physical exam, Dr. Arellano noted, "He is currently compensated with no overt CHF

on physical exam" and that plaintiff's hypertension was much better controlled  (R. 186).

Two months later, on August 7, 2006, plaintiff returned to Dr. Yearwood.  Dr. Yearwood

noted that plaintiff's congestive heart failure appeared to be stable.  Dr. Yearwood wrote, "He is

currently applying for disability – which appears is reasonable due to his compromised cardiac

14

status and inability to work." (R. 195). Dr. Yearwood completed a "Clinical Assessment of Pain" form on that day, circling responses to indicate that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work," that physical activity would result in "[g]reatly increased pain and to such a degree as to cause distraction from tasks or abandonment of tasks," and that side effects of prescribed medication would result in "[s]ome limitations . . . but not to such a degree as to create serious [p]roblems in most instances." (R. 193). On that day, Dr. Yearwood also completed a "Physical Capacities Evaluation" form. He circled or checked responses to indicate that, in an eight hour work day, plaintiff can: sit four hours at a time for a total of eight hours, stand four hours at a time for a total of two hours, and walk one hour at a time for a total of two hours. Dr. Yearwood indicated that plaintiff can: lift up to five pounds continuously, six to ten pounds frequently, never lift twenty-one or more pounds; never use his hands for pushing or pulling of arm controls; use both hands continuously for simple grasping and fine manipulation; never use his feet for pushing and pulling of leg controls; stoop, crouch, kneel, crawl and reach overhead occasionally; never climb or balance; work around moving machinery frequently; never drive automotive equipment or work at unprotected heights; and never be exposed to marked changes in temperature or humidity, or to "dust, fumes & gas fumes." Dr. Yearwood further indicated that plaintiff is likely to be absent from work more than four days per month as a result of his impairments or treatment. (R. 192). Two weeks later, Dr. Yearwood completed another form entitled "Ability to Work," in which he expressed his opinion that plaintiff is not able to work the equivalent of eight hours a day, five days a week, and that his conditions have lasted or can be expected to last at least twelve months. Dr. Yearwood wrote nothing in a space on the form provided for explanation or comments. (R. 194).

15

On September 6, 2006, plaintiff returned to Dr. Yearwood for follow-up.  He reported that he was doing well.  Dr. Yearwood again noted that plaintiff's congestive heart failure "appears to be stable at this time." (R. 208).  A month later, Dr. Yearwood wrote that plaintiff's congestive heart failure "appears to be quite stable at this time."  Plaintiff complained of muscle cramps in his lower legs, and Dr. Yearwood planned to check plaintiff's potassium level.  (R. 207).

On October 25, 2006, plaintiff returned to Dr. Yearwood complaining of a rash after he dropped some insulation on his forehead.  Dr. Yearwood noted that the rash looked like herpes zoster.  He assessed herpes zoster and cellulitis involving the left scalp and upper eyelid.  (R. 206). By November 1, 2006, according to Dr. Yearwood's treatment note, the herpes zoster had resolved with the use of medication. (R. 205).  In a December 4, 2006 follow-up appointment, Dr. Yearwood noted that plaintiff's hypertension was controlled and that plaintiff had a history of angioedema associated with the use of Altace.  Dr. Yearwood switched his medication from Altace to Diovan. (R. 204).

Plaintiff returned to Dr. Arellano at Montgomery Cardiovascular Associates on December 8, 2006.  He denied any chest pain, shortness of breath, PND, presyncope or syncope.  He stated that he was able to walk one half mile each day and that he has to stop occasionally but "usually is able to complete this without any symptoms."  He reported that, about once a week, he has a sensation of his heart beating faster, which lasts for about fifteen minutes but has no associated symptoms. Plaintiff complained that his lower lip had been swelling for two weeks and that he had a dry cough. Dr. Arellano noted that plaintiff's cardiomyopathy is "currently compensated with no overt CHF on physical exam."  (R. 223-224).  She discontinued his Altace due to the lower lip swelling, and started him on Diovan. She observed that his hypertension is well-controlled and that he had

continued to refuse an ICD.  She advised plaintiff to follow up in six months. (R. 224).

Plaintiff returned to Dr. Yearwood one month later, on January 8, 2007.  Dr. Yearwood wrote, "patient presents for follow-up – doing well."  His blood pressure was noted to be stable on his current medication.  (R. 203).  The following month, on February 5, 2007, Dr. Yearwood wrote, "Patient presents for evaluation with a history of diaphoresis associated with episodes of feeling weak. Patient however denies complaints of shortness of breath, chest pain, or palpitations." (R. 202).

The next day, plaintiff sought treatment from Dr. Arellano. He reported that the previous day – when he was at Dr. Yearwood's office – he "had an episode where he became diaphoretic and weak, and felt as if he were going to pass out."  (R. 221).  He told Dr. Arellano that his "EKG did not show any change and that his blood pressure and pulse were okay."  He was otherwise "doing well without any chest pain, now CHF symptoms, no palpitations, no pre-syncope or syncope other than above."  Dr. Arellano noted that plaintiff had cut down on his walking but "he is still walking about half a mile a day without any difficulty.  (R. 221).  She wrote, again, that his cardiomyopathy "is currently compensated with no overt CHF on physical exam."  She stated, "He has finally agreed to have an ICD done and so we will arrange follow-up with Dr. Crawford, and she has requested a repeat echocardiogram since it has been over a year since his last one."  Dr. Arellano observed that plaintiff's "diaphoretic spell may have been secondary to V-tach."  She advised him to return to the office if it recurred.  Plaintiff's hypertension was again noted to be well-controlled. (R. 221-222). Plaintiff had an echocardiogram that day. Because of technical difficulties with the images, plaintiff's ejection fraction was estimated to be approximately 40%.  He was noted to have normal left ventricular size and trace-to-mild mitral regurgitation.  Dr. Arellano planned to get a "MUGA"

17

to better assess plaintiff's ejection fraction. (R. 218-19).

Plaintiff had the MUGA scan on February 9, 2007. His heart was noted to be of normal size and his "[o]verall ejection fraction [was] estimated at 60-65%." Dr. Wynn Crawford concluded that plaintiff had a "[m]ildly abnormal MUGA scan with some mild apical hypokinesis." She further concluded, "The gated left ventricular ejection fraction is 0.62." (R. 216). Dr. Crawford evaluated the plaintiff a few days later, on February 13, 2007. She noted his history of cardiomyopathy. She described the "spell" that he had in Dr. Yearwood's waiting room: "He had some fluttering in his chest that lasted about two minutes. A few minutes later he had another episode." Dr. Crawford stated, however, that "he did not get his heart rate or blood pressure checked with either episode. He has not had any syncope or near-syncope. He has had no chest pain, PND, orthopnea or pedal edema. He has occasional shortness of breath. His energy level is okay. He walks about a half a mile twice a week." Dr. Crawford noted that plaintiff "still smokes half a pack of cigarettes a day" and "drinks a six-pack of beer a day." Dr. Crawford remarked that the MUGA scan "show[ed] an injection fraction of 62%, which is vastly better." (R. 214). Her impressions were idiopathic cardiomyopathy, "hypertension, controlled," and "[s]pell of sweating and fluttering." With regard to the latter, Dr. Crawford wrote, "I have to consider the possibility that there is progression of the underlying coronary disease." (R. 215). She stated "ICD is not required at present, given his improved ejection fraction." She recommended a Holter monitor to assess his palpitations, a nuclear Myoview stress test to look for underlying ischemia, and follow-up with Dr. Arellano. (R. 215).

The Myoview scan was performed on February 26, 2007. Dr. Crawford concluded that the scan was abnormal "with evidence for scar and/or prolonged ischemia in the distal anterior wall and

septum, which are normally supplied by the left anterior descending coronary artery." She further noted "mild to moderate evidence for scar and/or prolonged ischemia in the inferior septum" and a gated left ventricular ejection fraction of 55% "with wall motion abnormalities as described." (R. 211-12). An EKG conducted at the same time showed a "left bundle branch block." (R. 211).

On March 6, 2007, Dr. Yearwood noted that plaintiff's congestive heart failure "appears to be stable at this time." Plaintiff reported a history of shortness of breath on exertion. Dr. Yearwood observed that plaintiff was evaluated by Dr. Crawford and was "noted not to be a candidate for a pacemaker." (R. 201). The following month, on April 9, 2007, Dr. Yearwood again noted that plaintiff's congestive heart failure appeared to be stable. Plaintiff had no additional complaints "except for some orthopnea." (R. 200). Dr. Yearwood again completed the three forms he had completed previously. For the "Clinical Assessment of Pain," Dr. Yearwood circled responses indicating that "Pain is present and found to be intractable and virtually incapacitating this individual[,]" and that physical activity would result in an increase of plaintiff's pain "to such an extent that bed rest and/or medication is necessary." He did not respond to a question about side effects of prescribed medication. (R. 198). In the PCE form, Dr. Yearwood indicated that plaintiff can, in an eight-hour day: sit for a total of eight hours at a time; stand for four hours at a time for a total of eight hours; walk for one hour at a time for a total of two hours; lift up to five pounds continuously; lift six to ten pounds frequently; lift twenty-six to fifty pounds occasionally; and never lift more than fifty pounds. Dr. Yearwood did not respond to the section of the form asking how much plaintiff is able to carry. Dr. Yearwood concluded that plaintiff can use his hands for grasping, pushing and pulling of arm controls and fine manipulation continuously; use his feet for pushing and pulling of leg controls continuously; reach overhead continuously; stoop, crouch, kneel or crawl

occasionally; never climb, balance, or drive; never be exposed to dust, fumes or gas fumes; never work around moving machinery or at unprotected heights; and never be exposed to marked changes in temperature and humidity.  Dr. Yearwood indicated that plaintiff was likely to be absent from work more than four days per month as a result of his impairment or treatment.  (R. 197).  On the "Ability to Work" form, Dr. Yearwood indicated that plaintiff is not able to work the equivalent of eight hours a day five days a week, and that his condition has lasted or is expected to last at least twelve months.  To explain his conclusions, Dr. Yearwood wrote, "patient has a history of congestive heart failure."  (R. 199).

On May 9, 2007, plaintiff returned to Dr. Yearwood.  He complained of shortness of breath on exertion but denied orthopnea.  (R. 250).  A month later, on June 11, 2007, Dr. Yearwood noted that plaintiff's congestive heart failure was "stable at this time."  He wrote, "He is still complaining of problems with exercise tolerance and fatigue. Compliance with medication reinfor[ce]d." (R. 249).  Dr. Yearwood noted that plaintiff "also has a history of depression – after discussion this appears to have been brought on by his history of erectile dysfunction."  (R. 249).  The following month, on July 11, 2007, Dr. Yearwood again noted that plaintiff's congestive heart failure "appears to be compensated at this time."  Plaintiff complained of hot flashes and Dr. Yearwood planned to "check his thyroid and testerone profile."  (R. 248).

Plaintiff returned to Dr. Arellano at Montgomery Cardiovascular Associates on July 31, 2007.  Dr. Arellano wrote, "He currently is doing well without any chest pain.  He did have one episode on Thursday when he became short of breath all of a sudden.  It lasted about 15 minutes and he has had no recurrence. He denied any dyspnea on exertion.  He is able to walk a mile without any symptoms, no congestive heart failure symptoms. [N]o presyncope or syncope. He is

complaining of a new fluttering in his chest that occurs about two times per week.  It lasts about 10 minutes." Dr. Arellano prescribed an event monitor due to the palpitations. She noted that plaintiff's hypertension was "well controlled."  With regard to plaintiff's cardiomyopathy, Dr. Arellano wrote, "His last nuclear study showed his EF had returned to normal at fifty-five.  He also had a MUGA which showed his EF was 62 with mild apical hypokinesis." She advised plaintiff to continue taking his current medications.  (R. 229-230).

In an office visit two weeks later, Dr. Yearwood noted that plaintiff's congestive heart failure and his blood pressure were stable.  (R. 247).  The following month, on September 13, 2007, plaintiff sought treatment from Dr. Yearwood for sinus congestion associated with post-nasal drip. Dr. Yearwood wrote, "Patient doing well otheriwse [sic] with no additional complaints. Patient deneis [sic] a history of shortness of breath or chest pain." Dr. Yearwood assessed allergic rhinitis. (R. 246). Plaintiff returned to Dr. Yearwood on October 30, 2007, for follow-up of his sinus congestion. Dr. Yearwood wrote, "Patient doing well otheriwse [sic] with no additional complaints at this time.  Denied any shortness of breath or chest congestion."  (R. 245).

On November 26, 2007, plaintiff had a consultative pulmonary function test at Baptist Medical Center South.  He had an initial $FEV_1$ of 2.50, or 58% of predicted.  After an Albuterol treatment plaintiff had an $FEV_1$ of 2.39, or 56% of predicted.  (R. 225-227).  A chest x-ray taken the following day was normal.  (R. 228).   On January 9, 2008, Dr. Yearwood noted that plaintiff's congestive heart failure was stable. Plaintiff had no complaints other than left hand pain and swelling, associated with tendonitis, and sinus congestion with post-nasal drip.  (R. 244).  Plaintiff returned to Dr. Yearwood a month later, on February 7, 2008.  Dr. Yearwood noted that plaintiff's hypertension was controlled. He wrote, "Patient doing well at this time with no additional

complaints of chest pain or shortness of breath." (R. 243). The following month, plaintiff's congestive heart failure was again noted to be stable. Plaintiff continued to complain of pain and inflamation of his left wrist. Dr. Yearwood diagnosed congestive heart failure and tendonitis of the left wrist. (R. 242). On April 22, 2008, Dr. Yearwood noted that plaintiff's congested heart failure was "compensated." He observed, "Pateint [sic] otheirwse [sic] doing well with no additional complaints at this time." (R. 241).

Just before midnight on May 23, 2008, plaintiff presented at the Baptist Medical Center South emergency room. He was ambulatory, and had gun shot wounds to his upper left shoulder and right hip. He stated that his daughter's boyfriend came to his house and shot him. (R. 280). Plaintiff was "evaluated for intrathoracic and intraabdominal injury" and was discharged from the ER "after significant injury was ruled out." (R. 254). Plaintiff's physical examination was within normal limits except for pain and swelling due to the gunshot wounds. (R. 256-257).

On June 10, 2008, plaintiff returned to Dr. Yearwood for a checkup, complaining of a head cold. He told the intake nursing assistant that he had been shot in his left shoulder and right leg two weeks previously. In a section of the form for functional status assessment, the intake worker noted that plaintiff is able to dress himself, do his own shopping, get out of bed by himself and feed himself "with no needed assistance." Plaintiff reported no pain at that time, and that he had not experienced pain in the last week or month. (R. 240). In the office visit that day, Dr. Yearwood noted that plaintiff's hypertension was controlled and his congestive heart failure was stable. He stated that the plaintiff was otherwise doing well "except for the fact that he was shot in the shoulder 2 weeks ago with a 22 gauge gun" and was "also complaining of some sinus congestion." (R.239).

Plaintiff returned for follow-up with Dr. Yearwood on July 8, 2008. On intake, he complained of having cramps in both hips and thighs and of arm and hand swelling "when he uses them a lot." (R. 238). He was again noted to be able to dress himself, feed himself, do his own shopping and get out of bed by himself without any assistance. He reported a pain level of 6-7, off and on for the previous three weeks. (R. 238). Dr. Yearwood diagnosed congestive heart failure and muscle cramps. (R. 237). A month later, on August 5, 2008, plaintiff complained to Dr. Yearwood of numbness in his right toe. He was again noted to be able to dress himself, feed himself, do his own shopping, and get out of bed by himself with no assistance. He reported no pain. (R. 236). Dr. Yearwood again reported that plaintiff's congestive heart failure was stable. He stated that plaintiff had been complaining of "some numbness involving his right foot without evidence of vascular compromise." (R. 235). When plaintiff next returned to Dr. Yearwood, on September 2, 2008, the "paraesthesiae involving his right lower leg appear[ed] to have resolved." Dr. Yearwood noted plaintiff's congestive heart failure to be stable, and plaintiff denied any orthopnea or paroxysmal nocturnal dyspnea. (R. 234).

On October 14, 2008, plaintiff complained to Dr. Yearwood of wrist pain "sometimes" and that his legs get tired while he is walking. He was noted, again, to be able to dress himself, feed himself, do his own shopping and get out of bed by himself. (R. 233). Dr. Yearwood observed that plaintiff's congestive heart failure was stable, and that he had "intermittent pain involving his left wrist a[s]sociated with a tendonitis" but that he was "otheirwse [sic] doing well." Dr. Yearwood diagnosed "[t]endonitis left wrist" and gave plaintiff samples of Celebrex. (R. 232). The following month, on November 13, 2008, plaintiff returned to Dr. Yearwood. His congestive heart failure was again noted to be stable. He was complaining of intermittent pain in his hip, thigh and lower leg.

Dr. Yearwood diagnosed congestive heart failure.  (R. 231).

<u>The ALJ's Decision and Plaintiff's Request for Review</u>

The ALJ issued a decision on March 17, 2009, concluding that plaintiff had not been under a disability as defined in the Social Security Act from June 8, 2004, the alleged onset date, through the date of the decision.  (R. 34-35).  He found that plaintiff has the following severe impairments: cardiomyopathy, plantar fasciitis, hypertension, Type II diabetes mellitus, coronary artery disease, status post congestive heart failure, and status post gunshot wound to the right hip and left upper back.  (R. 22).  The ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the commissioner's listing.  (R. 25).  He made two separate RFC findings, one for the period of June 28, 2004, through May 23, 2008, and the second for the period from May 24, 2008, through the date of the decision.  (R. 25-27).  The ALJ concluded that the claimant is unable to perform any of his past relevant work (R. 32-33), but that he retains the residual functional capacity to perform jobs existing in significant numbers in the national economy considering his age, education and work experience.  (R. 33-34).  Plaintiff again requested review by the Appeals Council, and provided the Appeals Council with another medical statement from Dr. Yearwood, dated February 5, 2009. (R. 11, 14).  Dr. Yearwood wrote:

> LAWRENCE CHEATHAM has been under my care for a history of congestive heart failure. He was initially noted to have a significant loss of left ventricular function with a documented ejection fraction of 25%. The etiology of this was described as idiopathic.
>
> Such poor left ventricular function usually results in significant symptoms of

loss of exercise capacity associated with shortness of breath with minimal exertion.

It has become apparent that with reduced exertion his left ventricular function has improved significantly and has resulted in an improvement in his symptoms.

However in light of the severity of his initial presentation it is clear that Mr. Cheatham is disabled and will no doubt manifest a deterioration of his cardiac capacity and level of functioning if placed in an enviro[n]ment requiring an increase in his exercise capacity.

Please note that the above statements are based on objective findings based on diagnostic testing completed by his cardiologists.

(Doc. # 10-1, Exhibit A to plaintiff's brief).[2]  The Appeals Council considered the additional evidence but, nevertheless, denied review on December 16, 2009.  (R. 8-11).

## DISCUSSION

Plaintiff argues that the ALJ erred by crediting the opinion of Dr. Evans – a non-examining physician – and that his RFC finding is, accordingly, not supported by substantial evidence.  He further contends that the Appeals Council erred in denying plaintiff's request for review in light of Dr. Yearwood's February 5, 2009, statement. (Doc. # 10).

With regard to the ALJ's decision, plaintiff does not argue that the ALJ erred by rejecting the opinions of Dr. Yearwood which were then in evidence. (See Doc. # 10, pp.

---

[2]  Dr. Yearwood's February, 2009, statement is not included in the certified administrative transcript filed by the Commissioner, but is attached as Exhibit A to plaintiff's brief. (Doc. # 10). However, the statement was included in the Appeals Council's exhibit list (R. 11) and the Commissioner concedes that the statement was "inadvertently left out of the certified administrative record." (Doc. # 11, p. 5 n. 2).  Accordingly, the court treats the exhibit as part of the administrative record.

7-8). Instead, plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ "based his RFC finding upon the medical opinions expressed by a non-examining physician," the medical expert who testified at the administrative hearing. (Id., p. 7).

To resolve the issue raised by the plaintiff, however, the court must first determine whether the ALJ applied legal standards properly in assigning weight to the contrary opinion expressed by plaintiff's treating physician and whether his decision in that regard is supported by substantial evidence. The ALJ committed no error in assessing Dr. Yearwood's opinions. (See Exhibits 5F and 6F). The ALJ gave "some" weight to Dr. Yearwood's PCE and "very little, if any" weight to Dr. Yearwood's opinion that plaintiff suffers from intractable pain. Citing the scans and cardiac tests showing plaintiff's cardiac condition to be stable and his ejection fraction to be essentially normal, the ALJ reasoned that Dr. Yearwood's opinion that plaintiff suffers from intractable pain was contrary to the weight of the evidence. The ALJ further concluded that Dr. Yearwood's opinion about the level of plaintiff's pain was contrary to Dr. Yearwood's own opinion, expressed in the PCE form, that plaintiff can perform the exertional requirements of a range of medium work. (See R. 30-31, 197-98).[3] The ALJ further noted that Dr. Yearwood's opinion regarding the

---

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). In April 2007, Dr. Yearwood indicated that, in an 8-hour workday, plaintiff can sit for 8 hours straight, stand for four hours at a time for a total of eight hours, and walk for an hour at a time for a total of two hours, lift six to ten pounds frequently and up to 50 pounds occasionally; that he can use both hands continuously for simple grasping, pushing and pulling of arm controls and fine manipulation; and

severity of plaintiff's pain – *i.e.* that it is intractable and virtually incapacitating – is contradicted by plaintiff's hearing testimony that his pain is "not too strong," lasts 10-15 minutes at a time and occurs only twice a month.  (R. 30-31, R. 304-05).

The ALJ stated good cause for failing to give Dr. Yearwood's opinion controlling or considerable weight, and his reasons are supported by substantial evidence.  Because he discounted Dr. Yearwood's opinion properly, the ALJ was entitled to rely on the opinion expressed by the non-examining medical expert.  Contrary to plaintiff's argument, an ALJ's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about plaintiff's functional capacity.  See Green v. Social Security Administration, 223 Fed. Appx. 915, 923 (11th Cir. 2007)(unpublished opinion)(ALJ's RFC assessment supported by substantial evidence where he rejected treating physician's opinion properly and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician).[4]  Additionally, it is clear

---

that he is able to use both feet continuously for pushing and pulling of leg controls." (R. 197). He expressed no conclusion at all – and, accordingly, no limitation – regarding plaintiff's ability to lift eleven to twenty-five pounds. (Id.). However, Dr. Yearwood also indicated that plaintiff suffers from intractable, "virtually incapacitating" pain which would, with "physical activity, such as walking, standing, sitting, bending, stooping, moving [of] extremities, etc.," increase the plaintiff's pain "to such an extent that bed rest and/or medication is necessary." (R. 198).

[4]  The Eleventh Circuit stated:

Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record lacked substantial evidence to support a finding that she could perform light work. Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work. Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained was

from the ALJ's decision that he did not rely solely on Dr. Evans' testimony but, also, considered and relied on the treatment notes of Dr. Yearwood and plaintiff's cardiologists.

Plaintiff's contention that the Appeals Council erred in denying review in light of Dr. Yearwood's letter is also without merit. The Appeals Council "may deny review if, even in the light of the new evidence, it finds no error in the opinion of the ALJ." Pritchett v. Commissioner, Social Security Administration, 2009 WL 449177 (11th Cir. Feb. 24, 2009)(unpublished opinion)(citing Ingram, 496 F.3d at 1262). The Appeals Council concluded that Dr. Yearwood's letter "[did] not provide a basis for changing the Administrative Law Judge's decision." (R. 9).

Plaintiff points to Dr. Yearwood's statement that plaintiff would "no doubt manifest a deterioration of his cardiac capacity and level of functioning if placed in an environment requiring an increase in his exercise capacity." (Doc. # 10, pp. 5-6). Plaintiff then argues – without citation to supporting evidence – that "[p]erforming light exertional work eight hours a day, five days a week, *would no doubt require an increase in his exercise capacity.*" (Doc. # 10, p. 6)(emphasis added).[5]  However, Dr. Yearwood's letter does not explain the

the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work.

223 Fed. Appx. at 923.

[5]  Plaintiff's allegation of Appeals Council error relies on Dr. Yearwood's statement that plaintiff's cardiac condition and level of function would deteriorate if he is placed in an environment requiring an increase in his exercise capacity, not on Dr. Yearwood's opinion that plaintiff is

term "exercise capacity," does not state plaintiff's present level – however measured – of "exercise capacity," and does not indicate that full time work at a light exertional level constitutes an "environment requiring an increase in [plaintiff's] exercise capacity."  In June 2005 – a full year after his alleged onset date – plaintiff reported to his cardiologist that he "continue[d] to work as a construction worker two times a week" and, although he was "mildly fatigued at the end of the day," he was "able to perform his tasks without any difficulty." (R. 164).  While he reporting working only two days a week, plaintiff's construction job was performed, at least, at a light exertional level.  (R. 329).  The treatment records from plaintiff's treating cardiology specialists do not reflect that they ever placed him on any work restrictions or suggested that exerting himself in this manner would or could result in a deterioration of his condition. (See Exhibits 2F, 4F, 7F, 10F).  Additionally, on the two occasions in which they referred to it in their treatment notes, plaintiff's cardiologists described plaintiff's "exercise tolerance" as "pretty good" in April 2005 and "good" in December 2005.  (R. 167, 190).

The court cannot determine – as plaintiff urges – that the record supports a finding that performing light work on a full-time basis requires an exercise capacity in excess of plaintiff's present exercise capacity.  Upon its review of the record as a whole, the court concludes that the February 5, 2009, letter from Dr. Yearwood does not deprive the

---

"disabled." (Doc. # 10, pp. 4-7). In his half-page response to this contention, the Commissioner relies exclusively – and unhelpfully – on the well-settled premise that a physician's conclusion that a patient is "disabled" is not entitled to special significance because it goes to an issue reserved to the Commissioner.  (See Doc. # 11, p. 14).

Commissioner's decision denying benefits of the support of substantial evidence.

## CONCLUSION

The court concludes that the Commissioner's decision is supported by substantial evidence and proper application of the law and that it is, accordingly, due to be affirmed. A separate judgment will be entered.

DONE, this 11th day of July, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE